ORIGINAL

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

DEC 11 2015    3:33

CLERK, U.S. DISTRICT COURT
By_____
Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| vs. | Case No. 4:15-CR-152-A |
| JAMES GATLIN   (02) | |

GOVERNMENT'S MOTION FOR DOWNWARD DEPARTURE

To the Honorable John McBryde, Judge:

The United States moves the Court to depart downward from the otherwise applicable guideline range in imposing sentence upon the defendant, James Gatlin, in recognition of his substantial assistance to the government in the investigation and prosecution of others.   In support of the same, the United States would show:

1.   Under the provisions of *U.S.S.G. § 5K1.1*, the Court, in determining whether and to what extent to grant a departure for substantial assistance to the Government, should evaluate:   (1) the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered; (2) the truthfulness, completeness, and reliability of any information or testimony provided by the defendant; (3) the nature and extent of the defendant's assistance; (4) any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance; and (5) the timeliness of the defendant's assistance.   The government will address each of those considerations in turn.

### *Significance and Usefulness of Defendant's Assistance*

2.  The defendant has been interviewed by agents from the DEA and ATF on several occasions dating back to his arrest in the instant case.  When he was arrested, James Gatlin cooperated with law enforcement by luring his methamphetamine supplier and co-conspirator, David Godinez, into an undercover purchase of methamphetamine, which led to Godinez's subsequent arrest and prosecution.  In turn, David Godinez also cooperated with law enforcement and he too lured his supplier and co-conspirator, Ismael Rico, into an undercover purchase of methamphetamine, which led to Rico's subsequent arrest and prosecution.

In addition, James Gatlin testified at the jury trial of *United States v. Casey Rose*, 3:14-CR-00367-B (26).  Mr. Rose represented himself in his own defense.  Attached is Gatlin's testimony against Mr. Rose.

### *Truthfulness, Completeness, and Reliability*

3.  The interviewing agents, through corroboration of other debriefs and statements, believe that the defendant has provided truthful and complete information regarding her and other's involvement in the events that give rise to Count One of the indictment.

### *The Nature and Extent of the Defendant's Cooperation*

4.  The government believes that the preceding paragraphs have delineated the nature and extent of the defendant's cooperation and demonstrate that his cooperation has materially advanced the Government's investigation and potential prosecution of others.

### *Danger, Injury or Risk of Danger to the Defendant*

5.    The government is not aware of any danger, injury or risk of danger to the

defendant because of his cooperation.

### *Timeliness*

6.    Defendant Gatlin's cooperation was timely in regards to the instant case.

### *Government's Recommendation*

7.    In recognition of the defendant's substantial assistance and the quality of his

information, the United States respectfully requests that the Court depart from the

applicable guideline range.


Respectfully submitted,

JOHN R. PAKER
UNITED STATES ATTORNEY

_____

SHAWN SMITH
Assistant United States Attorney
State Bar of Texas No. 24033206
Burnett Plaza, Suite 1700
801 Cherry Street, Unit # 4
Fort Worth, Texas 76102
Telephone:   817.252.5200
Facsimile:   871.978.3094

APPROVED FOR FILING

ALEX LEWIS
Assistant United States Attorney
Deputy Criminal Chief - Fort Worth Division

## CERTIFICATE OF CONFERENCE

I hereby certify that I have conferred with counsel for the defendant, Michael Levine. He does not oppose the granting of this motion.

SHAWN SMITH
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on December 11, 2015 the foregoing Government's Motion for Downward Departure was served by first class mail to Michael Levine at 325 N. St. Paul Street, Suite 2100, Dallas, Texas 75201, counsel for defendant.

SHAWN SMITH
Assistant United States Attorney

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

UNITED STATES OF AMERICA,    )
                             )
            Plaintiff,       )
                             )
vs.                          )   3:14-CR-00367-B(26)
                             )
CASEY ROSE (26),             )
                             )
            Defendant.       )

PARTIAL TRANSCRIPT OF JURY TRIAL
TESTIMONY OF JAMES GATLIN
BEFORE THE HONORABLE JANE J. BOYLE
UNITED STATES DISTRICT  JUDGE
SEPTEMBER 16, 2015

A P P E A R A N C E S
For the Government:

    UNITED STATES ATTORNEY'S OFFICE
    1100 Commerce Street - 3rd Floor
    Dallas, TX  75242
    214/659-8600
    BY:  P.J. MEITL
         JOHN KULL

CASEY ROSE, PRO SE

Standby Counsel for Casey Rose:

    LAW OFFICE OF SCOTT M. ANDERSON
    9557 Lakemont Drive
    Dallas, TX 75220
    469/279-2196
    BY:  SCOTT MILLER ANDERSON

COURT REPORTER:  SHAWNIE ARCHULETA, TX CCR No. 7533
                 1100 Commerce Street
                 Dallas, Texas 75242

proceedings reported by mechanical stenography,
transcript produced by computer.

2

1      (In open court at 10:32 a.m.; jury present.)

2                    JAMES GATLIN,

3    having been first duly sworn, testified as follows:

4           THE WITNESS:  Yeah.

5           THE COURT:  Let's bring the jury in if you

6    will remain standing, please.

7                 (Jury enters courtroom)

8           THE COURT:  Ladies and gentlemen, I

9    apologize for the delay.  It was a semi-break.  But

10   in any event, we have been dealing with some legal

11   issues since I last saw you, and that's what's taken

12   so long.  That's why we had to keep you outside.

13   Apologize for the delay.

14          I think we can move ahead and ask the

15   government to call their next witness, please.

16          MR. MEITL:  Yes, Your Honor.  The

17   government calls Mr. James Gatlin, and he's on the

18   stand.  And may the record reflect that he's already

19   been sworn in prior to the jury's entrance into the

20   courtroom.

21          THE COURT:  So reflect.

22               DIRECT EXAMINATION

23   Q.   (By Mr. Meitl)  Mr. Gatlin, good morning.

24   Please state and spell your name for the record.

25   A.   James Gatlin, J-A-M-E-S, G-A-T-L-I-N.

1  Q.   Again, we see by your attire that you are

2  incarcerated; is that correct?

3  A.   Yes, sir.

4  Q.   Can you tell the jury why you are incarcerated?

5  A.   I'm on a conspiracy charge to distribute

6  methamphetamine.

7  Q.   All right.  Did you go to trial or did you

8  plead guilty?

9  A.   I pled guilty.

10  Q.   Have you been sentenced yet?

11  A.   No, sir.

12  Q.   Which judge are you before?

13  A.   McBryde out of Tarrant County.

14  Q.   All right.  And is that out in Fort Worth?

15  A.   Yes, sir.

16  Q.   So you are not before Judge Boyle, you are

17  before Judge McBryde?

18  A.   Correct.

19  Q.   Can you open that binder in front of you and

20  look at Exhibit 42?

21  A.   Yes.

22  Q.   Do you see what this document is entitled?

23  A.   Factual Resume.

24  Q.   Yes.  Turn to page 2.  Do you see your

25  signature on that page?

1  A.    Yes, sir.

2  Q.    And do you see your signature of your attorney

3  on that page?

4  A.    Yes, sir.

5  Q.    Did you sign this after reviewing it with him?

6  A.    Yes.

7  Q.    Is this the document that you filed with the

8  Court whereby you pled guilty?

9  A.    Yes.

10          MR. MEITL:   Your Honor, at this time the

11  government moves to admit Government's Exhibit 42

12  into evidence.

13          THE COURT:   Mr. Rose, any objection?

14          MR. ROSE:   No, ma'am.

15          THE COURT:   Okay.  Government's Exhibit 42

16  is admitted.

17  Q.    (By Mr. Meitl)  Mr. Gatlin, did you and I meet

18  today to discuss that you would testify at trial?

19  A.    Yes.

20  Q.    Did I tell you that you needed to tell the

21  truth above all else?

22  A.    Yes.

23  Q.    Did I also tell you that I would not use

24  anything that you told me in that meeting against

25  you at your sentencing or in other proceedings?

1  A.    Correct.

2  Q.    Meaning you were free to tell me any other drug

3  activities.

4  A.    Yes, sir.

5  Q.    Are you hoping to receive anything in exchange

6  for your testimony today?

7  A.    Yes, sir.

8  Q.    What are you hoping to receive?

9  A.    Hopefully some time off.

10  Q.    You're hoping that your sentence that Judge

11  McBryde ultimately gives you will be less because of

12  your testimony today?

13  A.    Correct.

14  Q.    Have any promises been made by me or Mr. Kull

15  or anyone on the government as to how much time off?

16  A.    No, sir.

17  Q.    Did we even talk about numbers, about what the

18  sentence might be and what it might be after you

19  testify?

20  A.    No, sir.

21  Q.    Who is it ultimately up to as to what your

22  sentence is?

23  A.    Judge McBryde.

24  Q.    Now, what happens if you lie on the stand

25  today?

1    A.    Get in trouble.  You're not supposed to lie,

2    not on the stand.  I will get charged with -- I

3    don't know what the charge is, but I know there is a

4    charge.

5    Q.    Did I tell you that if you lie on the stand,

6    either way, whether it's good or bad for either side

7    of the case, that I will tell Judge McBryde that you

8    did that?

9    A.    Yes, sir.

10   Q.    And do you understand that Judge McBryde may

11   use that in making your sentence worse?

12   A.    Yes, sir.

13   Q.    Do you know an individual by the name of Casey

14   Rose?

15   A.    Yes, sir.

16   Q.    Do you see him in the courtroom today?

17   A.    Yes, sir.

18   Q.    Can you identify him by telling us where he's

19   sitting and what he's wearing?

20   A.    At the left table; has a jacket on, white

21   shirt.

22         MR. MEITL:  Your Honor, may the record

23   reflect that the witness has identified the

24   defendant Casey Rose?

25         THE COURT:  It will so reflect.

1  Q.   (By Mr. Meitl)  How do you know Casey Rose?

2  A.   Mutual friends.

3  Q.   Did you ever engage in any kind of activity

4  with Mr. Rose?

5  A.   Yes, sir.

6  Q.   What kind of activity?

7  A.   He purchased methamphetamine; sale of GHB.

8  Q.   And did you purchase it from him or did he

9  purchase it from you?

10 A.   The meth I purchased from him; the GHB he

11 purchased from me.

12 Q.   Okay.  And before we get into the purchases, do

13 you know whether Mr. Rose is involved in any kind of

14 gang or -- any type of gang?

15 A.   He told me one time he was ABT.

16 Q.   What do you understand ABT to be?

17 A.   Aryan Brotherhood of Texas.

18        MR. ROSE:  Your Honor, I object.  He's

19 leading the witness with these questions.  Do you

20 know if Mr. Rose has ever been in a gang?

21        THE COURT:  Rephrase the question, please.

22        Objection sustained.

23 Q.   (By Mr. Meitl)  Mr. Gatlin, have you ever had

24 any discussions with Mr. Rose about gangs?

25 A.   No.

1  Q.    Have you ever had any discussion with Mr. Rose

2  about a gang known as the Aryan Brotherhood of

3  Texas?

4  A.    No.

5  Q.    Have you ever had any discussion with Mr. Rose

6  about his membership in any gang?

7  A.    Discussion, no.

8  Q.    Have you ever heard Mr. Rose make any

9  statements about the ABT?

10  A.    One time.

11  Q.    What did he say?

12  A.    When an incident in my home happened, he said

13  that he was ABT; if you want to come find me, you

14  know where I'm at.

15  Q.    Okay.  When he said, "ABT," what did I

16  understand ABT to be?

17  A.    Aryan Brotherhood of Texas.

18  Q.    All right.  Going back to these purchases, you

19  said you purchased methamphetamine from Casey Rose;

20  is that correct?

21  A.    Yes, sir.

22  Q.    How often did you purchase methamphetamine from

23  Casey Rose?

24  A.    I purchased meth about -- I would say about ten

25  times total.  I started off buying an ounce.  I

1  bought a couple of ounces a couple of other times

2  and a few QPs, which is four ounces apiece.

3  Q.    When you say, "QP," does that stand for quarter

4  pound?

5  A.    Yes, sir.

6  Q.    So just so I understand, about ten times

7  started off at an ounce and then moved up to four

8  ounces at a time?

9  A.    Yes.

10 Q.    Where did these transactions take place if you

11 know?

12 A.    I've met him at Spanish Trails Hotel, there's a

13 Knights Inn, and random parking lots.

14 Q.    Okay.  And about what time, just by year, did

15 these transactions take place?

16 A.    Summer of 2014.

17 Q.    How much would you pay for an ounce of

18 methamphetamine when you bought it from Mr. Rose?

19 A.    550, 575.

20 Q.    So if you bought four ounces of

21 methamphetamine, do you get a deal?  Is the price

22 less?

23 A.    Yes.

24 Q.    How much would you pay for four ounces of

25 methamphetamine?

1   A.    2,000, 2,200.

2   Q.    Did you personally pay that money to Mr. Rose?

3   A.    Yes.

4   Q.    Did Mr. Rose personally hand you

5   methamphetamine?

6   A.    Yes.

7   Q.    So Mr. Rose was in possession of that

8   methamphetamine before he gave it to you?

9   A.    Yes.

10  Q.    And then he distributed it to you, correct?

11  A.    Yes.

12  Q.    Did you use any of that methamphetamine?

13  A.    Yes.

14  Q.    So do you know, in fact, based on your

15  experience of drugs, whether that was

16  methamphetamine?

17  A.    Yes, it was.

18  Q.    Was it?

19  A.    Yes.

20  Q.    Okay.  What did you do with the rest of the

21  methamphetamine?

22  A.    Sold it.

23  Q.    To other individuals?

24  A.    Yes, sir.

25  Q.    Can you describe for the jury how an individual

1  actually uses methamphetamine?  What's the process?

2  A.   You get a glass pipe, which you can buy at

3  any -- about any gas station.  It's got a bowl on

4  the end and a hole in the top.  You stick the

5  methamphetamine in there and heat it up and smoke

6  it.

7  Q.   And what is the form of the methamphetamine

8  when you put it in the glass pipe?

9  A.   Looks like ice.  Looks like -- like a -- I

10  always said it looks like a stalactite or something

11  like that.

12             THE COURT:  Always say what?

13             THE WITNESS:  A stalactite.

14             THE COURT:  Stalactite.

15             THE WITNESS:  Like the crystals that grow,

16  yes.

17  Q.   (By Mr. Meitl)  Have you ever heard the term

18  shards in reference to methamphetamine?

19  A.   Yes, sir.

20  Q.   What does that mean?

21  A.   That just means that it's in like a

22  crystallized form, like a --

23  Q.   Mr. Gatlin, if you could just sit forward a

24  little bit.  We can't hear you?

25  A.   Like an ice crystal.

1   Q.    So if someone says, I have shards, or, do you

2   have any shards, what do you understand that to

3   mean?

4   A.    Methamphetamine.

5   Q.    Now, when you use methamphetamine, what does it

6   do in your experience to you?  How does it make you

7   feel?

8   A.    Gives you energy, makes you -- makes your head

9   different.  Gives your body a high.

10  Q.    Did you find it addictive, personally?

11  A.    Yes.

12  Q.    Did you ever trade anything for the

13  methamphetamine other than cash with Mr. Rose?

14  A.    GHB.

15  Q.    What is GHB?

16  A.    It is a -- people say it's like liquid ecstasy.

17  I don't know exactly how to --

18  Q.    Is it drug?

19  A.    Yes, it's a drug.

20  Q.    Is it illegal to possess if you know?

21  A.    Yes.

22  Q.    Okay.  All right.  Now you said you pled guilty

23  to a conspiracy; is that right?

24  A.    Yes, sir.

25  Q.    Who did you conspire with in general, without

1   saying names, what types of people?

2   A.    Just people I sold to, people I bought from.

3   Q.    And you told us earlier that you bought from or

4   traded with Casey Rose.

5   A.    Correct.

6   Q.    Did you conspire with him?

7   A.    Yes.

8   Q.    All right.  Did Mr. Rose ever come to your

9   residence?

10  A.    Yes.

11  Q.    And when did that occur?

12  A.    That was -- I want to say it was somewhere in

13  the end of summer, beginning of fall of 2014.

14  Q.    Okay.  You're not sure of the exact date but

15  around that time?

16  A.    Right, correct.

17  Q.    All right.  Okay.  And why did he come to your

18  house if you know?

19  A.    He came to my house for the fact of we were

20  discussing over the phone about a Mustang.  He said

21  he had a friend that was locked up and needed money

22  and wanted to sell the Mustang.  I had a friend that

23  wanted it.  And I was assuming that was the reason

24  he was there.

25  Q.    Okay.  Let me just stop you.  You said a

1   Mustang.  Do you mean a car or horse?

2   A.    Yes, I mean a vehicle; yes.

3   Q.    So you understood he was coming to your house

4   to purchase or at least look at a car for purchase.

5   A.    No.  He was selling me the car.

6   Q.    I see.  And you had a friend who was buying the

7   car.

8   A.    Correct.

9   Q.    So you were just facilitating or brokering the

10  transaction?

11  A.    Yes.

12  Q.    Was anyone else with him when he came to the

13  house?

14  A.    Yes.

15  Q.    Who?

16  A.    A guy by the name of Ben Melton and some

17  female.  I don't know what her name was.

18  Q.    When you said, "Ben Melton," do you know how to

19  spell his last name?

20  A.    No, I don't.

21  Q.    What happened when Mr. Rose got to your house?

22  A.    He came to the house.  My roommate actually

23  looked out the peephole, seen somebody out there,

24  didn't know who it was, started to walk away.  I

25  went to the door, and I noticed him through the

1    peephole, kind of a glint of him, and I opened the

2    door.  "Hey, Casey, what's up?"  I invited him into

3    the house.  We sat down on the couch, and we

4    discussed our discussion about the Mustang.

5              MR. ROSE:  Objection, Your Honor.  I don't

6    see the relevance of selling a Mustang to selling

7    methamphetamine.

8              THE COURT:  Mr. Meitl?

9              MR. MEITL:  We're about to get there,

10   Judge, if you give us a little leeway, next two

11   sentences.

12             THE COURT:  Okay.  I will overrule and

13   allow them to follow through and connect it up under

14   Rule 104.

15   Q.   (By Mr. Meitl)  Go ahead, Mr. Gatlin, what

16   happened after you discussed the Mustang?

17   A.   Well, we sat down and offered a bowl.  We

18   smoked a bowl.  And I had just re-upped on

19   methamphetamine, plus I had GHB at the house.  I'm

20   figuring once they -- once he realized that or they

21   realized that, then as we were going to get up to

22   leave to go get this Mustang, supposedly, he pulls a

23   gun on me, Ben Melton pulls a gun and --

24             MR. ROSE:  Objection, Your Honor.  I don't

25   understand.

```
 1              THE COURT:  What's the objection?  That
 2   it's not relevant?
 3              MR. ROSE:  That he's lying.  I don't
 4   understand.  I don't understand --
 5              THE COURT:  You will get a chance to ask
 6   him on cross.  Overruled.
 7   A.    And they -- and he said, "Get on the ground,
 8   get on the ground."  I sit down, the two other guys
 9   that were there at my home plus my roommate.  My
10   roommate -- Ben Melton, had went into the room,
11   threw her on the ground, and so everyone is on the
12   ground.  Casey tells Ben to go get the safe.  I'm
13   guessing he thought I still had a small safe, but I
14   had a big safe.  And he drags it out to the living
15   room and attempts to -- wants to open it.  I give
16   him the code because I'm not trying to get anybody
17   hurt.  I give him the code.  They open the safe.
18   There was some pills in there, there was my pistol.
19   They got that.  There was also -- in my bag that was
20   next to me in the living room was five ounces of
21   methamphetamine that I had, plus the -- I want to
22   say it was a little over half a gallon to
23   three-quarters of a gallon of GHB, they got that.
24   They got some weed that was in my bag, too.  And
25   before they left, he told him -- he told Ben, "Slash
```

1    the tires."  So he slashed the tires of each

2    vehicle, and then they left.

3    Q.    Okay.  Now, you said that they got this or

4    that.  You discussed the various things.

5    A.    Yes.

6    Q.    When you say that, what do you mean?

7    A.    Cell phones; all our cell phones they took.

8    Q.    When you say, "they got that," what do you mean

9    they did with it?  Did they take it?

10   A.    Yes, they took it.  They stole it.

11   Q.    They stole it from you.

12   A.    Yes or robbed me.  I don't know what you want

13   to call it.

14   Q.    You said some cell phones?

15   A.    Yes.

16   Q.    They stole cell phones.

17   A.    Yes.

18   Q.    They stole five ounces of methamphetamine?

19   A.    Yes.

20   Q.    How do you know it was methamphetamine?

21   A.    Because I smoke it.  I mean, I purchased it.

22   Q.    And it was in your possession.

23   A.    Yes.

24   Q.    All right.  And then you said they also stole

25   some pills and they tried to get into your safe.

1   A.   Yes.  Well, they got in the safe, I mean, after

2   I gave them the code.

3   Q.   Did they steal your wallet or anything like

4   that?

5   A.   Yes, they got my wallet.

6   Q.   All right.  And you said they slashed your

7   tires, correct?

8   A.   Yes.

9   Q.   You said five ounces of methamphetamine.

10  What's the street value of five ounces of

11  methamphetamine?

12  A.   Right now about 2,400, 2,500.

13  Q.   Okay.  And did you see Mr. Rose personally

14  holding a gun during this incident?

15  A.   Yes.

16  Q.   And again, when was this?  Was this in the

17  summer or fall of 2014?

18  A.   Yes.

19  Q.   Did you report this to the police?

20  A.   No.

21  Q.   Why not?  If I was robbed by someone I would

22  report that to the police.

23  A.   I would, too, but it was -- it involved drugs,

24  so of course not.  I'm not going to call the police

25  and say, hey, I just got robbed for a bunch of

1  drugs.

2  Q.    Okay.  Now, you said earlier that he made some

3  comment to you -- was it at this time -- about the

4  ABT?

5  A.    Yes, it was.

6  Q.    So tell us when he was stealing from you, when

7  did this occur?

8  A.    Right before they walked out the door, he

9  looked straight at me and told me that, "I am ABT.

10  If you got a problem with this, you know where I

11  live, Pleasant Grove.  I'm a Grove Rat.  Come find

12  me," and then he took off.

13  Q.    Did you say Grove Rat?

14  A.    Yes.

15  Q.    How did you perceive that?  Did you perceive

16  that just to be idle chatter or something else?

17  A.    I just perceived it as basically throwing it in

18  my face, really.  I robbed you, ha ha.  That's the

19  way I felt.

20  Q.    And did you view it as a threat to you in any

21  way?

22  A.    Not really.

23  Q.    Why --

24  A.    Kind of, but not in that sense, I guess.  I was

25  just kind of stunned it all happened in the first

```
 1   place.  You know.
 2   Q.    Okay.
 3               MR. MEITL:  Those are all of the questions
 4   I have for you, sir.
 5               THE COURT:  Mr. Rose.
 6                    CROSS-EXAMINATION
 7   Q.    (By Mr. Rose)  Are you a member of the Aryan
 8   Brotherhood, sir?
 9   A.    No, sir.
10   Q.    You said that you conspired with me to sell
11   methamphetamine.
12   A.    Correct.
13   Q.    Is my name on your paperwork?
14   A.    No, it is not.
15               THE COURT:  When you say, "paperwork,"
16   you're talking about his plea agreement?
17   Q.    (By Mr. Rose)  I'm talking about anything.
18   Indictment, plea agreement, something that's saying
19   when did my name and your name coincide with this
20   conspiracy to sell methamphetamine?  When?  You said
21   this happened the summer or fall of last year --
22   A.    Correct.
23   Q.    -- can you give me a month or at least two
24   months, somewhere in there?
25   A.    June, July.
```

1   Q.   June and July of last year.  This is 14 months

2  later.  How long ago did mine and your name -- did

3  my name come out of your mouth about me conspiring

4  with you?

5  A.   Just recently.

6  Q.   How recently, sir?

7  A.   Since I have been talking with the DA and my

8  lawyer.

9  Q.   Can you give me -- is it six months?

10  A.   Past few weeks.

11  Q.   Past few weeks?

12  A.   Yes.

13  Q.   Can you tell me, Mr. Gatlin, I have looked into

14  your -- you said you had a pistol inside the safe.

15  A.   Correct.

16  Q.   Are you convicted felon, sir?

17  A.   Yes, I am.

18  Q.   Is it illegal for you to possess a gun?

19  A.   Yes, it is.

20  Q.   Why did you have that gun?

21  A.   For protection.

22  Q.   Protection from who?

23  A.   Protection from anyone.

24  Q.   You felt you needed that gun for protection.

25  When I came over to the house that day, where was

1  the gun at?

2  A.    In my safe.

3  Q.    Why didn't you have the gun on your person if

4  you wanted it for protection?

5  A.    Because I don't have it on my person.  It's a

6  dangerous weapon, so I'm not just going to carry it

7  on my body.  I don't do those kind of things.

8  Q.    Can you tell me, do you manufacture the drug

9  GHB?

10  A.    I have in the past.

11  Q.    Were you manufacturing the drug GHB last year?

12  A.    Yes, I was.

13  Q.    Would you please tell the jury how you

14  manufacture GHB?

15  A.    What do you mean by tell them how I

16  manufacture --

17  Q.    Can you tell us the process of manufacturing

18  GHB.

19        MR. MEITL:  Objection, Your Honor.  I

20  don't see the relevance of this.

21        THE COURT:  Overruled.

22  A.    Yes.  You get the chemical lactone.

23  Q.    (By Mr. Rose)  What is lactone, sir?

24  A.    It's a retarder thinner for silk screen

25  printing.

1  Q.    How do you get this chemical, sir?

2  A.    You buy it from a company.

3  Q.    Can me or Mr. Meitl go to the company and just

4  buy the chemical?

5  A.    Sometimes you can, yes, depending on what

6  company you go to.

7  Q.    Could you tell me a company that I could just

8  go to to get this chemical?

9  A.    I've actually went downtown Dallas when they

10  had -- I can't remember the name of the company.

11  Q.    How long ago was this, sir --

12  A.    What?

13  Q.    -- that you're talking about, that you went to

14  downtown Dallas to purchase this chemical?

15  A.    That would have been like four years ago.

16  You're talking about recently?

17  Q.    Yes, sir.

18  A.    McLogan's in California.

19  Q.    I'm talking about since I've known you, sir.

20  A.    McLogan's in California.  It's a supply

21  company.

22  Q.    So you have to go to California to get this

23  chemical.

24  A.    No, order it over the phone.

25  Q.    And you've actually done this.

1   A.   Yes.

2   Q.   Can you -- okay.  Go ahead -- you know, I'm

3   going to skip the process of making GHB.  Is GHB

4   commonly known as the date rape drug, sir?

5   A.   Yes, it is.

6   Q.   And can you tell me why it's known as the date

7   rape drug?

8   A.   Because when mixed with alcohol or taking too

9   much, a person will pass out or they will what they

10  call G-out, and they will pass out.  And a lot of

11  times in the past guys will put it in women's drinks

12  at a club and have sex with them after they pass

13  out.

14  Q.   Against their will?

15  A.   Yes.

16  Q.   And you manufacture this drug?

17  A.   I have, yes.

18  Q.   Can you tell me about your roommate, your

19  female roommate named Ashley?  Can you tell me about

20  her?

21  A.   I haven't had a roommate named Ashley.

22  Q.   Can you tell me about the woman that was found

23  hanging in your garage by you?  Is her name Ashley?

24  A.   No.  Her name was Amber; close.  Amber Kennedy.

25  Q.   Can you tell me about that day, sir?

```
 1              MR. MEITL:  Your Honor, I will object.
 2    This is not relevant.
 3              THE COURT:  Sustained.  Sustained.
 4    Q.   (By Mr. Rose)  Were you sleeping with her, sir?
 5              MR. MEITL:  Objection.
 6              THE COURT:  Sustain the objection on this
 7    particular young lady named Amber.  Go ahead.
 8    Q.   (By Mr. Rose)  Are you HIV positive?
 9    A.   Yes, I am.
10              MR. MEITL:  Objection, Your Honor.
11              THE COURT:  Overruled.  It's already out.
12    Q.   (By Mr. Rose)  Do you give females this drug
13    GHB and sleep with them?
14    A.   No.
15    Q.   What do you do with this drug when you
16    manufacture it?
17    A.   I've sold it and I've drank it.
18    Q.   Did you give it to females?
19              THE COURT:  I think you already asked him
20    that.
21              MR. ROSE:  He said no.
22              THE COURT:  I know, but you're asking him
23    the same question.
24              MR. ROSE:  Because he's lying.  He's
25    lying.
```

```
 1            THE COURT:  Remember, questions.

 2            MR. ROSE:  Yes, ma'am.

 3   Q.    (By Mr. Rose)  The day that you -- this

 4   incident is bothering me, and I'm trying to ask

 5   questions to you, sir, as most respectful as

 6   possible.

 7            THE COURT:  We are getting to statements

 8   again, Mr. Rose.  You know better than that.

 9   Q.    (By Mr. Rose)  The day me and Melton came to

10   your house, sir, who ran out the door -- on a

11   statement I read, it was a gallon and a half of GHB

12   is what you told the officers the first time?

13   A.    Okay.

14   Q.    And you told us a while ago it was

15   three-quarters of a gallon, which is half of that?

16   A.    To be honest with you, I really can't remember

17   exactly how much it was.

18   Q.    But you can remember five ounces of

19   methamphetamine but you can't remember --

20   A.    Yes, because I just re-upped.  That's why I

21   remember that.

22   Q.    But a gallon of GHB is a milk jug full of GHB.

23   A gallon and a half is a milk jug and a half.

24   Three-quarters of a gallon is not two containers,

25   it's one container three-quarters of the way full,
```

1  correct?

2  A.   Yes.

3  Q.   How many containers of GHB did you have in your

4  house?

5  A.   A few containers.  They didn't all match up to

6  a whole gallon, no, not in each one.

7  Q.   So the first statement you gave was incorrect

8  when you said a gallon and a half.

9  A.   I guess it was.

10  Q.   And who grabbed those two gallons and ran out

11  of your house?

12  A.   I can't remember exactly who grabbed them.  I

13  know you had my bag that had all the dope in it.

14  The gallons, I do not remember who handled those.

15  Q.   And I had a pistol in my hand is what you are

16  saying.

17  A.   Yes, a pistol in one hand and the bag in the

18  other.

19  Q.   Were you in the bathroom when the guy with me

20  ran out of your house?

21  A.   No, I was on the couch.  You had me lay down on

22  the couch and face the opposite direction.

23  Q.   You say he cut the tires on your car.

24  A.   Correct.  Slashed one tire on each car.

25  Q.   How many cars were there?

1   A.    Four.

2   Q.    You seen him cut these tires?

3   A.    No, but I heard them.  And then afterwards I

4   seen the aftermath, I mean flat tires.

5   Q.    Mr. Gatlin, you don't know, it could have been

6   me that slashed those tires.

7   A.    Outside the house, it could have been you.

8   Inside the house --

9            THE COURT:  Sit up closer to the

10  microphone, please, Mr. Gatlin.  Thank you.

11  A.    Outside the house, I'm not sure exactly who did

12  it.  Inside the house in the garage, it was Ben

13  Melton.

14  Q.    How do you know this person Ben Melton?

15  A.    Well, for one because you brought him to my

16  house.  And then I asked a person that I know what

17  this person's name was and --

18  Q.    Can you tell us who that person is for the

19  Court?

20  A.    Shawn Frazier.

21  Q.    How does Shawn Frazier know me or Ben Melton?

22  A.    I don't know if he knows you, but I know he

23  knows Ben Melton.  That's what he -- that's what he

24  has told me.

25  Q.    Did he tell you my name?

1   A.   No.

2   Q.   Well --

3   A.   I already knew your name.

4   Q.   I'm not understanding how you are identifying

5   somebody that's with me as Ben Melton.  How did you

6   come to that conclusion?  Somebody -- Shawn Frazier

7   told you this; is that correct?

8   A.   Yes, correct.

9   Q.   When was the first -- when did you report --

10   I'm not disputing the fact with you, sir, about the

11   GHB.  I saw -- I saw -- did you see Ben Melton run

12   out your house with the GHB?

13   A.   I do not remember, no.  I do not remember.  But

14   y'all did take it.  It could have been the chick.  I

15   really don't remember.

16   Q.   I'm sure it was him, sir.  I'm sure it was him.

17   He was my ride at the time, was he not?

18   A.   Correct.

19   Q.   And after this incident happened, did I try to

20   contact you through text messages?

21   A.   I don't remember.

22   Q.   Did I contact you and say I'm sorry for what he

23   did in the text messages and I will try to make it

24   right, I'm sorry for what happened?

25   A.   It's possible.  I don't really remember if you

1  did or not.

2  Q.    You said in your mailbox -- what did you find

3  in your mailbox?

4  A.    In A manila envelope I found my driver's

5  license and my Social Security card.   Someone had

6  brought it back to my house.

7  Q.    Did your roommates find a driver's license and

8  Social Security cards of theirs?

9  A.    No, just mine.

10 Q.    Is there records of -- you said the cell phones

11 were taken.   Is there records of you getting a new

12 cell phone -- I mean, you would have to activate a

13 new cell phone if your cell phone was taken.

14 A.    Well, yes, of course I did.

15 Q.    So do you have records of this?

16 A.    Not on hand I don't.

17 Q.    Do you have text messages or anything proving

18 or showing that I have bought drugs from you?   Are

19 there records of this?

20 A.    If it is it's on my phone somewhere.   I

21 couldn't tell you where.

22 Q.    Are you mad at me because I couldn't make it

23 right; because Ben grabbed your GHB and ran out the

24 door and I didn't stop him, instead I cut your

25 tires.   Are you mad about that?

1   A.   I'm upset that I was robbed, yes.

2   Q.   Are you upset enough to sit there and lie and

3   say I robbed you of five ounces of methamphetamine

4   and pulled a gun on you?

5   A.   No, I'm just telling the truth.

6   Q.   What would make you want to tell that truth

7   today when this just happened over a year ago?  Why

8   wouldn't you say something before?  Why wouldn't you

9   say something when you first got locked up?

10          THE COURT:  You've got to let him answer

11   the question.  Okay?  You asked him why he didn't

12   say this before, so let him answer that question.

13   A.   I didn't say anything before because other

14   people that were in -- basically people were trying

15   to find you, that's why.

16   Q.   (By Mr. Rose)  People were trying to find me?

17   A.   Yes.

18   Q.   For what purpose?

19   A.   Because you robbed more than me; you robbed

20   multiple people.

21   Q.   And you can attest to this?

22   A.   I cannot attest to it; I was not there, no.

23   I'm just going by what I was told.

24   Q.   By who?  Who told you this?  Who told you I

25   robbed other people?  Who, sir?

```
 1   A.    I can't remember all their names.  There's a
 2   chick in --
 3   Q.    One person, give me one person.
 4              THE COURT:  Mr. Rose, calm down.
 5   A.    I can't remember everybody's name.  Okay?  I
 6   can't.
 7   Q.    (By Mr. Rose)  Why are you sitting there lying
 8   to me?
 9   A.    I'm not lying.
10              THE COURT:  This is argumentative.
11              MR. ROSE:  I'm sorry, ma'am.  I apologize.
12   I'm not trying --
13              THE COURT:  You don't need to talk to me.
14   Just ask a question, please.
15              MR. ROSE:  Yes, ma'am.
16   Q.    (By Mr. Rose)  This methamphetamine -- we will
17   stick to the methamphetamine.  Let me go to your
18   criminal record, sir.  Can I bring that up?
19        Have you been arrested for theft?
20   A.    Have I been arrested for theft?
21   Q.    Have you been arrested for burglary?
22   A.    Yes, I have.
23   Q.    You have.  Have you been arrested for theft?
24   A.    One time, yes.
25   Q.    Were you convicted on these charges?
```

```
 1   A.    Yes.

 2   Q.    How many times were you arrested for burglary?

 3   A.    I was arrested once but it was three counts.

 4   Q.    Okay.

 5   A.    And I was 17 years old.

 6   Q.    Okay.  Was that a felony charge?

 7   A.    Three counts of felony, yes.

 8   Q.    Thank you.  And sir, one theft charge?

 9   A.    Yes.  Stage F felony.

10   Q.    What about your possession charges?  Do you

11   have a small possession charge in the beginning,

12   like less than one gram?

13   A.    Yes.

14   Q.    And then later on you got a little bigger dope

15   charge?

16   A.    Yes.

17   Q.    And then, again, a fourth time you got another

18   dope charge?

19   A.    Yes.

20   Q.    And then just recently you were busted with ten

21   ounces of methamphetamine?

22   A.    Close to 11.

23   Q.    Close to 11.  That's a very big dope charge.

24   Sounds to me like --

25             THE COURT:  Question, question, question.
```

1    Q.    (By Mr. Rose)  Are your crimes increasing?

2    A.    Yes, they have.

3    Q.    Are you a thief?

4    A.    No.

5    Q.    Does your past reflect you being a burglar or a

6    thief?

7    A.    Yes, it does.

8    Q.    But you're not a thief?

9    A.    No, I'm not.

10   Q.    You're not a liar, either, are you, sir?

11   A.    No.

12          THE COURT:  Anything else, Mr. Rose?

13   Q.    (By Mr. Rose)  There's just -- other than his

14   testimony, you have no record of me buying or

15   selling drugs to you or from you, do you?  Do you

16   have any record, text messages, phone call log,

17   anything?

18   A.    Well, I don't have text message records with

19   me, no.  If we do, then it's on the phone somewhere.

20   Q.    What phone, sir?

21   A.    I can't remember, man.  I've had multiple

22   phones, so I couldn't tell you.  MetroPCS is the

23   company you would want to go to.

24   Q.    It would be under your name, sir?  James

25   Gatlin.

1    A.    Yeah.

2    Q.    In the months of, let's say, May, June, July --

3    A.    Okay.

4    Q.    -- there will be a record of text message

5    records.

6    A.    If there's any messages, it would be on the

7    MetroPCS phone, yes.

8    Q.    And is that how we communicated, sir?

9    A.    Yes.

10           MR. ROSE:  All right.  I got no further

11   questions, Your Honor.

12           MR. MEITL:  Nothing further, Your Honor.

13           THE COURT:  Mr. Gatlin, I'm going to

14   excuse you.  I will remind you as I have with the

15   other witnesses not to talk about the case other

16   than with the lawyers until the case is over.  Okay?

17           Call your next witness.

18       (END OF REQUESTED PORTION OF TRANSCRIPT.)

19

20

21

22

23

24

25

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER - 214.753.2747**

1                C E R T I F I C A T E

2              I, Shawnie Archuleta, CCR/CRR, certify

3    that the foregoing is a transcript from the record

4    of the proceedings in the foregoing entitled matter.

5              I further certify that the transcript fees

6    format comply with those prescribed by the Court and

7    the Judicial Conference of the United States.

8              This 21st day of October 2015.

9

10

11                    s/Shawnie Archuleta
                      Shawnie Archuleta CCR No. 7533
12                    Official Court Reporter
                      The Northern District of Texas
13                    Dallas Division

14

15

16   My CSR license expires:  December 31, 2015

17   Business address:  1100 Commerce Street
                        Dallas, TX  75242
18   Telephone Number:  214.753.2747

19

20

21

22

23

24

25

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER - 214.753.2747